Joseph J. Tabacco, Jr. (SBN 75484)
Daniel E. Barenbaum (SBN 209261)
A. Chowning Poppler (SBN 272870)
**BERMAN TABACCO**
44 Montgomery Street, Suite 650
San Francisco, CA 94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382
Email: jtabacco@bermantabacco.com
         dbarenbaum@bermantabacco.com
         cpoppler@bermantabacco.com

Nathaniel L. Orenstein
Mark Delaney
**BERMAN TABACCO**
One Liberty Square
Boston, MA 02109
Telephone: (617) 542-8300
Facsimile: (617) 542-1194
Email: norenstein@bermantabacco.com
         mdelaney@bermantabacco.com

*Counsel for Plaintiff Gloria Stricklin Trust*

[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GLORIA STRICKLIN TRUST, derivatively on behalf of Facebook, Inc., <br><br> Plaintiff <br><br> v. <br><br> MARK ZUCKERBERG, SHERYL K. SANDBERG, MARC L. ANDREESSEN, PETER A. THIEL, REED HASTINGS, ERSKINE B. BOWLES, SUSAN D. DESMOND-HELLMAN, and JAN KOUM <br><br> Defendants, <br><br> and <br><br> FACEBOOK, INC., <br><br> Nominal Defendant. | Case No. <br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff the Gloria Stricklin Trust ("Plaintiff") by its undersigned attorneys derivatively and on behalf of Nominal Defendant Facebook, Inc. ("Facebook" or the "Company"), files this Verified Shareholder Derivative Complaint against Defendants (defined *infra*) for breaches of fiduciary duties owed to the Company and for violations of federal and state laws.  Plaintiff makes the following allegations based upon personal knowledge as to itself and its own acts and, upon information and belief as to all other matters, based on the investigation conducted by its attorneys. This investigation included, among other things, review of the Company's conference calls; announcements and press releases; filings made by the Company with the U.S. Securities and Exchange Commission ("SEC"); corporate governance documents available on the Company's website; governmental and regulatory investigations of the Company and documents relating thereto; and news reports about the Company.

## NATURE OF THE ACTION

1.     This case concerns breaches by Facebook's board of directors ("Board") and senior officers in abdicating their fiduciary duties of oversight with respect to the Company's handling of confidential and private data relating to over 50 million users of Facebook's social media platform.

2.     Facebook has a history of failing to protect its users' private data.  Beginning in 2007, Mark Zuckerberg — the Company's co-founder, Chairman, and Chief Executive Officer ("CEO") — invited outside developers to build businesses off of Facebook's user data, giving them open access to, among other things, friend lists, "likes," and affinities which connect millions of Facebook users.

3.     This failure to protect private user data first became a matter of public concern in 2011, when Facebook entered into a consent decree ("Consent Decree") with the U.S. Federal Trade Commission ('FTC") over charges that it deceived consumers by telling them it would keep their information on Facebook private, and then repeatedly allowing user information to be shared with third-party developers and made public.

4.     The Consent Decree required Facebook to, among other things, "establish and implement, and thereafter maintain, a comprehensive privacy program that is reasonably

designed to address … privacy risks related to the development and management of new and existing products and services for consumers …."

5.     Despite the clear requirements of the Consent Decree, Facebook continued to allow third-party developers broad access to its user data, with the only apparent newly issued requirement being that developers represent that the user data would be used for "academic" purposes and that the data would be destroyed or deleted at the conclusion of the "academic" research.  Sandy Parakilas, a former platform operations manager at Facebook and a whistleblower on Facebook's lack of effective privacy protocols, was recently asked what kind of controls Facebook has over user data given to third parties and responded:

> Zero.  Absolutely none.  Once the data left Facebook servers there was not any control, and there was no insight into what was going on.[1]

6.     Not surprisingly, this "honor system" has been exploited by third parties intent on monetizing Facebook's treasure trove of information about its users.  This exploitation became a matter of public concern on March 17, 2018 when a pair of blockbuster reports from the *New York Times* and the UK's *Observer* claimed that Global Science Research ("GSR"), a Company headed by University of Cambridge professor Alexander Kogan, was granted unfettered access in 2014 to Facebook's user data under the auspices of "academic research." In a short period of time, GSR collected the data on over 50 million Facebook users without the users' knowledge or permission.   Compounding the harm, GSR turned around and sold the information to Cambridge Analytica, a data mining company.

7.     Cambridge Analytica married this Facebook user data with voter lists to create a "remarkably precise portrait" of the psychology of a large swath of the American electorate.[2]   It

---

[1]  Paul Lewis, *"Utterly horrifying": ex-Facebook insider says covert data harvesting was routine*, The Guardian (Mar. 20, 2018), https://www.theguardian.com/news/2018/mar/20/facebook-data-cambridge-analytica-sandy-parakilas.

[2]  Craig Timberg and Karla Adam, *How Cambridge Analytica's whistleblower became Facebook's unlikely foe*, The Washington Post (Mar. 21, 2018), https://www.washingtonpost.com/business/economy/how-cambridge-analyticas-whistleblower-became-facebooks-unlikely-foil/2018/03/21/ccb14038-2d33-11e8-911f-ca7f68bff0fc_story.html.

then sold this information to the Donald Trump presidential campaign, enabling Cambridge Analytica to specifically tailor Trump's campaign message to specific personality profiles — and to take advantage of certain prejudices and neuroses.  In the words of Christopher Wylie, a former Cambridge Analytica employee and whistleblower, "[w]e exploited Facebook to harvest millions of people's profiles.  And built models to exploit what we knew about them and target their inner demons. That was the basis the entire company was built on."[3]

8.      This massive data breach was known to Facebook's senior officers and its Board of Directors for years.  However, the officers and Board took no steps to see that the Company informed Facebook users or investors.  This has and will continue to result in significant harm to the Company in the form of reputational damage, product delays, loss of advertising revenue, new regulation, and governmental fines and penalties, as well as private litigation by Facebook users.

9.      As reported by the UK *Observer*, the Company became aware of the Cambridge Analytica data breach as early as 2015 but failed to inform the affected users or take any meaningful remedial action to secure user data.  While the Company did require GSR to "certify" that user data was destroyed, it did not independently confirm that this information was destroyed. The *New York Times* recently reported that its investigative team had viewed some of the raw data collected by GSR.

10.      By continuing to allow third-party access to user data without consent, Facebook breached the privacy of Facebook users.

11.      These facts also demonstrate that Facebook's senior officers and Board failed to appropriately implement the Consent Decree and otherwise failed to take key steps to live up to the promise of the Company's founder, when he stated in 2014 that:

> We're making a clear and formal long-term commitment to do the things
> we've always tried to do and planned to keep doing – giving you the tools

---

[3]  Carole Cadwalladr and Emma Graham-Harrison, *Revealed: 50 million Facebook profiles harvested for Cambridge Analytica in major data breach*, The Guardian (Mar. 17, 2018), https://www.theguardian.com/news/2018/mar/17/cambridge-analytica-facebook-influence-us-election.

to control who can see your information and then making sure only those people you intend can see it ….[4]

12.     That Facebook's Board and senior executives allowed unauthorized third-parties access to user data even after entering into the Consent Decree demonstrates their disregard for the fact that implementing privacy controls was essential to protect the Company.  This was a breach of their fiduciary duties to the Company.

13.     These failures have caused and continued to cause harm to the Company.  On March 26, 2018, the FTC announced that it was investigating whether the use of Facebook user data by Cambridge Analytica violated the Consent Decree.  The Company could face fines of $40,000 a day per violation if the FTC finds that Facebook violated the Decree.  There is speculation that the FTC could fine the Company as much as $2 billion.

14.     In addition, the Company has suffered harm to its reputation and business. Legislators and regulators have been so critical of Facebook that the Company's Chief Operating Officer, Sheryl Sandberg, stated that "Mark [Zuckerberg] has said, 'It's not a question of if regulation, it's a question of what type.'" According to Sandberg, "[w]e're open to regulation. We work with lawmakers all over the world."[5]

15.     Making matters worse, Facebook's senior executives and its Board were on notice that user data was at risk of compromise.  For years, the Company has been warned by current and former employees about the risks associated with Facebook's policy on sharing user data and has been the subject of a government investigation relating to its privacy policies.  For example, in 2009, the Canadian Privacy Commissioner that found Facebook's data handling procedures violated Canadian law by letting "developers have [] virtually unrestricted access to Facebook users' personal information."[6]

---

[4] Anita Balakrishnan, Sara Salinas &| Matt Hunter, *Mark Zuckerberg has been talking about privacy for 15 years — here's almost everything he's said*, CNBC (Mar. 21, 2018), https://www.cnbc.com/2018/03/21/facebook-ceo-mark-zuckerbergs-statements-on-privacy-2003-2018.html.

[5] https://www.cnbc.com/2018/03/22/facebook-coo-sheryl-sandberg-its-not-a-question-of-if-regulation-its-a-question-of-what-type.html

[6] https://www.priv.gc.ca/en/opc-news/news-and-announcements/2009/nr-c_090827/

1    16.    By failing to ensure that the Company appropriately implemented the Consent

2    Decree and by releasing private user data, which in turn is causing the Company massive harm,

3    Defendants are liable for breaches of fiduciary duties and violations of Section 14(a) of the

4    Securities Exchange Act of 1934 ("Exchange Act"), as well as violations of other federal and

5    state statutes regarding the confidentiality of electronic data. In this shareholder derivative

6    action, Plaintiff, on behalf of Facebook, seeks to recover for these and other harms sustained by

7    the Company as a result of Defendants' wrongdoing.

8    **JURISDICTION AND VENUE**

9    17.    This Court has subject matter jurisdiction over this action under Article III of the

10   United States Constitution and 28 U.S.C. § 1331 because of claims arising under Section 14(a)

11   of the Exchange Act, 15 U.S.C. § 78n(a) and SEC regulation 14a-9 promulgated thereunder and

12   has jurisdiction over the state-law claims in accordance with 28 U.S.C. § 1367.  The Court has

13   exclusive jurisdiction under Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

14   18.    This Court has jurisdiction over each of the Defendants because each Defendant

15   has sufficient contacts with California in order to render the exercise of jurisdiction by this

16   Court over them permissible under California Code of Civil Procedure § 410.10 as well as

17   under the United States and California Constitutions and the traditional notions of fair play and

18   substantive justice.  Facebook is headquartered in California, and through their misconduct,

19   Defendants caused substantial harm and injury in California and to California citizens.

20   19.    Venue is proper in this District in accordance with Section 27 of the Exchange

21   Act, 15 U.S.C. § 78aa.  Venue is also proper under 28 U.S.C. § 1391(b) because: (i) Facebook

22   maintains its principal place of business in this District, and it has its most significant contacts

23   with the Northern District of California; (ii) one or more of the Defendants resides in this

24   District; (iii) a substantial portion of the transactions and wrongs complained of in this

25   Complaint occurred in this District; and (iv) Defendants received substantial compensation in

26   this District by doing business here and engaging in numerous activities that had effects in this

27   District.

28

20.     This action is not a collusive one to confer jurisdiction that the Court would otherwise lack.

## INTRADISTRICT ASSIGNMENT

21.     Assignment to the San Francisco Division of this district is proper under Northern District of California Civil Local Rule 3-2(c) because a substantial part of the events of omissions which give rise to the claims asserted herein occurred, and Facebook's principal place of business is located, in Santa Mateo County, California. Under Civil Local Rule 3-2(d), all civil actions which arise in the county of Santa San Mateo shall be assigned to the San Jose Division.

## PARTIES

22.     Plaintiff, Gloria Stricklin Trust, is a shareholder of Facebook, which has continuously owned shares of the common stock of the Company during the relevant period.

23.     Nominal defendant Facebook, Inc. is a Delaware corporation with its principal executive office located at 1601 Willow Road, Menlo Park, California 94025. Facebook's securities trade on the NASDAQ under the ticker symbol "FB." Facebook operates a social media and social networking service with more than 2 billion monthly active users as of June 2017.

24.     Defendant Mark Zuckerberg ("Zuckerberg") is the co-founder of Facebook and is currently its chairman and CEO.  As of March 31, 2017, Zuckerberg owned or controlled more than 2 million Facebook Class A (low vote) shares and owns more than 459 million Facebook Class B (high vote) shares, allowing him to control more than 86% of the Company's combined voting power.   His holdings in Facebook are estimated to be worth about $86 billion. In 2018, Zuckerberg sold 5,423,200 shares of his Facebook holdings for over $978 million, while in possession of material inside information regarding the Company's lack of internal controls designed to protect the security and/or privacy of user data.

25.     Defendant Sheryl K. Sandberg ("Sandberg") has been Facebook's Chief Operating Officer ("COO") since 2008 and has been a director of Facebook since June 2012. Prior to her role at Facebook, Sandberg was vice president of Global Online Sales and

1     Operations at Google, chief of staff for the United States Treasury Department under President

2     Clinton, a management consultant with McKinsey & Company, and an economist with the

3     World Bank. In 2018, Sandberg sold 196,684 shares of her Facebook holdings for over $35

4     million, while in possession of material inside information regarding the Company's lack of

5     internal controls designed to protect the security and/or privacy of user data.

6         26.     Defendant Marc L. Andreessen ("Andreessen") has been a director of Facebook

7     since June 2008 and is also a member of the Audit Committee and Compensation &

8     Governance Committee. Mr. Andreessen is a co-founder and has been a General Partner of

9     Andreessen Horowitz, a venture capital firm, since July 2009.

10        27.     Defendant Peter A. Thiel ("Thiel") has been a director of Facebook since April

11    2005 and is also a member of the Compensation & Governance Committee.  Thiel has served as

12    President of Thiel Capital, an investment firm, since 1996 and a Partner of Founders Fund, a

13    venture capital firm, since 2005.

14        28.     Defendant Reed Hastings ("Hastings") has served as a director of Facebook

15    since June 2011 and also serves as Chairman of the Compensation & Governance Committee.

16    Hastings has served as the CEO and Chairman of the board of directors of Netflix, Inc., a

17    provider of an Internet subscription service for movies and television shows, since 1999.

18        29.     Defendant Erskine B. Bowles ("Bowles") has been a director of Facebook since

19    September 2011 and also serves as the Chairman of the Audit Committee.  Bowles is President

20    Emeritus of the University of North Carolina and served as President from January 2006

21    through December 2010.

22        30.     Defendant Susan D. Desmond-Hellman ("Desmond-Hellman") has served as a

23    director of Facebook since March 2013 and has been its Lead Independent Director since June

24    2015.  Desmond-Hellman is also a member of the Audit Committee and is the CEO of The

25    Gates Family Foundation and the Bill & Melinda Gates Foundation Trust.

26        31.     Defendant Jan Koum ("Koum") has been a director of Facebook since October

27    2014.  Koum is the co-founder and CEO of WhatsApp, a communication service that he co-

28    founded in 2009.  Facebook acquired WhatsApp in 2014.  In 2018, Koum sold 2,485,347 shares

1  of his Facebook holdings for over $442 million, while in possession of material inside

2  information regarding the Company's lack of internal controls designed to protect the security

3  and/or privacy of user data.

4        32.    Defendants Zuckerberg, Sandberg, Andreessen, Thiel, Hastings, Bowles,

5  Desmond-Hellman, and Koum are hereinafter collectively referred to as the "Defendants."

6        33.    Defendants Zuckerberg, Sandberg and Koum are hereinafter referred to as the

7  "Insider Trading Defendants."

8                        **SUBSTANTIVE ALLEGATIONS**

9  **I.      CORPORATE BACKGROUND**

10       34.    Facebook is an American online social media and social networking service

11 company.  Its website was launched on February 4, 2004 by Mark Zuckerberg, along with

12 fellow Harvard College students. The founders initially limited the website's membership to

13 Harvard students; later they expanded it to higher education institutions in the Boston area, the

14 Ivy League schools, and Stanford University.

15       35.    Facebook gradually added support for students at various other universities, and

16 eventually to high school students. Since 2006, anyone who claims to be at least 13 years old

17 has been allowed to become a registered user of Facebook, though variations on this minimum

18 age requirement exist, depending on local laws.

19       36.    In 2007, Zuckerberg stood on a stage in San Francisco and announced that

20 Facebook would allow broad access to its user data. No longer, he said, would Facebook be a

21 closed-off software product like every other social network. Instead, it would become an open

22 platform and invite outside developers to build apps and programs based upon user data and

23 preferences. "We want to make Facebook into something of an operating system," Zuckerberg

24 told a reporter.

25       37.    For a while, this open platform policy seemed to work.  Developers quickly went

26 to work making fun and quirky apps that plugged into Facebook — early hits included

27 "Rendezbook," a kind of proto-Tinder that allowed users to match with each other for "random

28 flings," and CampusRank, which allowed college students to nominate their peers for yearbook-

type awards. Later, popular games like FarmVille arrived.  Facebook got to weave itself more deeply into users' internet habits, and the outside app developers got access to a big audience and valuable data about their users. In all, millions of apps have been created with Facebook's open platform tools.

## II.      THE 2011 CONSENT DECREE

38.     At the same time that Facebook was providing developers with a treasure trove of user data, it was falsely telling consumers that the Company was protecting their privacy through a variety of methods.  For example, Facebook's *Central Privacy Page* and *Profile Privacy Page* have, in many instances, stated that the *Profile Privacy Settings* allow users to "control who can see" their profile information, by specifying who can access it, *e.g.*, "Only Friends" or "Friends of Friends."[7]

39.     Similarly, although the precise interface has changed over time, Facebook's *Profile Privacy Settings* specified that users could restrict access to their profile information to the audience the user selects, *e.g.*, "Only Friends," "Friends of Friends." In many instances, a user's *Profile Privacy Settings* have been accompanied by a lock icon.[8]

40.     Facebook failed to disclose, however, that restricting profile information to "Only Friends" or "Friends of Friends" would be ineffective as to certain third-party developers authorized by Facebook to aggregate and analyze user data and profile information.[9]  Among the profile information made available to these third-party developers include: user's birthday, hometown, activities, interests, status updates, marital status, education (*e.g.*, schools attended), place of employment, photos and videos.[10]

41.     In addition, Facebook failed to disclose that a user's choice to share his or her friends list with "Only Friends" would be ineffective as to third-party developers.  This created a risk that the Company's users could be subject to unwelcome contacts from persons who may

---

[7] *In the Matter of Facebook, Inc.*, No. 0923184 (FTC 2011) (the "FTC Complaint") at ¶¶ 10-11.

[8] *Id*. at ¶¶ 11-13.

[9] *Id*. at ¶ 14.

[10] *Id*.

have been able to infer their locale based upon the locales of their friends and their employer, as reflected in the user's account.[11]

42.     On November 29, 2011, Facebook entered into a Consent Decree with the FTC over charges that it deceived consumers by telling them they could keep their information on Facebook private, and then repeatedly allowing it to be shared and made public. The proposed settlement required Facebook to take several steps to make sure it lived up to its promises in the future, including giving consumers clear and prominent notice and obtaining consumers' express consent before their information is shared beyond the privacy settings they have established.  In addition, the Consent Decree required Facebook to:

> [E]stablish and implement, and thereafter maintain, a comprehensive privacy program that is reasonably designed to (1) address privacy risks related to the development and management of new and existing products and services for consumers, and (2) protect the privacy and confidentiality of [user] information.  Such program, the content and implementation of which must be documented in writing, shall contain controls and procedures appropriate to Respondent's size and complexity, the nature and scope of Respondent's activities, and the sensitivity of the [user] information, including …. The identification of reasonably foreseeable, material risks, both internal and external, that could result in Respondent's unauthorized collection, use, or disclosure of [user] information and an assessment of the sufficiency of any safeguards in place to control these risks.

43.     Notably, by its very terms, the Consent Decree required that Facebook "deliver a copy of this order to (1) all current and future principals, officers, directors, and managers" within 30 days of the order or their assuming such position within the Company.  Thus, every member of the Board and every officer knew of the Company's obligations under the Consent Decree.

44.     Pursuant to the Consent Decree, Facebook instituted some half-hearted efforts at transparency.  First, it made an effort to simplify its policies on handling user data and shortening the wording of its "Data Policy" from 9,000 words to 2,700 words in order to make it easier to read.  Facebook also released a new website called "Privacy Basics," which was an animated guide for "learning how to protect your privacy."  Facebook's Privacy Basics website

---

[11] *Id.* at ¶ 26.

offers details regarding what others see about you, how others interact with you, and how to control what you see on your news feed.

45.     Substantively, however, Facebook made little change to its "open door" policy of allowing third-party access to this data in the immediate aftermath of the Consent Decree. While Facebook nominally began restricting third-party access to "academic" purposes, the Company appears to have had no objective standards for determining where academic purposes ended and business purposes began.  Nor does it appear that Facebook had any mechanism to enforce this restriction.  Similarly, while Facebook requested that these third parties destroy user data at the completion of the purported academic research, there was no mechanism to confirm or enforce this request.

46.     Against this backdrop of inattention and neglect, Facebook granted access to its platform to Global Science Research, a research company headed by Aleksandr Kogan ("Kogan"), a professor of Psychometrics at the University of Cambridge.  Kogan was allowed to upload onto Facebook an application called "myPersonality," which allowed users to take psychological tests which assessed such personality traits such as openness, conscientiousness, extroversion, agreeableness, and neuroticism.

47.     About 270,000 people downloaded the app.  Unbeknownst to these participants, however, those who took this test also gave access to data and information on the users' friends, including their likes and profile information.  As such, as many as 50 million Facebook users were swept up in the data collection.

48.     Without any effective controls or supervision of Kogan's "research," Kogan then proceeded to monetize the data he gleaned from Facebook, selling it to Cambridge Analytica,[12] a political data firm hired by President Trump's 2016 election campaign. Cambridge Analytica married the Facebook user data with voter lists to create a "remarkably precise portrait" of the psychology of a large swath of the American electorate, which enabled the company to

---

[12] Cambridge Analytica has been largely funded by Robert Mercer, the wealthy Republican donor, and Stephen K. Bannon, a former adviser to the president who became an early board member and gave the firm its name. It has pitched its services to potential clients ranging from Mastercard and the New York Yankees to the Joint Chiefs of Staff.

1    specifically tailor Trump's campaign message to specific personality profiles — and to take

2    advantage of certain prejudices and neuroses.[13]

3

### III.    FAILURE TO PROTECT USER DATA – A SYSTEMIC AND CULTURAL PROBLEM

4

5        49.    Since news of the Facebook data breach hit the news, a number of former

6    employees have come forward to detail the lax culture at Facebook with regard to the protection

7    of user data.

8        50.    Sandy Parakilas, a former platform operations manager on the Facebook

9    platform team who led efforts to fix privacy problems in advance of the Company's IPO,

10   recently came forward as a whistleblower on Facebook's lack of effective privacy controls.

11   Parakilas recalled that there was no sincere commitment from executive management to address

12   problems — they were only concerned about suppressing negative publicity.[14]

13       51.    Asked what kind of controls Facebook has over user data given to third parties,

14   Parakilas responded:

15           Zero.  Absolutely none.  Once the data left Facebook servers there was not
             any control, and there was no insight into what was going on.[15]
16

17       52.    Similarly, Alexander Stamos ("Stamos"), Facebook's now-former Chief Security

18   Officer, has recounted many disagreements with other executives about how proactive the

19   Company should be in policing its platforms.  In 2016, when Stamos's team of engineers

20   uncovered Russia's use of the Facebook platform to interfere in the 2016 United States

21

22

23
         [13] Timberg and Adam, *How Cambridge Analytica's whistleblower became Facebook's*
24   *unlikely foe*, *supra*, https://www.washingtonpost.com/business/economy/how-cambridge-
     analyticas-whistleblower-became-facebooks-unlikely-foil/2018/03/21/ccb14038-2d33-11e8-
25   911f-ca7f68bff0fc_story.html.

26       [14] Sandy Parakilas, *We Can't Trust Facebook to Regulate Itself*, The New York Times
     (Nov. 19, 2017), https://www.nytimes.com/2017/11/19/opinion/facebook-regulation-
27   incentive.html.

         [15] Lewis, *"Utterly horrifying": ex-Facebook insider says covert data harvesting was*
28   *routine*, *supra*, https://www.theguardian.com/news/2018/mar/20/facebook-data-cambridge-
     analytica-sandy-parakilas.

presidential election, he faced opposition from Company executives about whether to make his findings public.

53.    Stamos ultimately created a report on the Russian interference that was largely scrubbed of mentions of Russia and winnowed into a blog post discussing — in hypothetical terms — how Facebook could be manipulated by a foreign adversary.  A single footnote in this blog post acknowledged that Facebook's findings did not contradict the January 2017 Report by the Director of National Intelligence, which concluded that Russia had sought to undermine the U.S. election and Hillary Clinton.

54.    Ultimately, Stamos's insistence on transparency led to his reassignment and then the announcement that he would leave the Company in August 2018.[16] Stamos released a statement on March 19, 2018 regarding his tenure at the Company and the issue of transparency, saying: "These are really challenging issues, and I've had some disagreements with all of my colleagues, including other executives."

55.    Indeed, in the wake of the public allegations of Russia using the Facebook platform during the 2016 presidential election, it appears that Facebook's primary goal was to downplay the Russian activity and to protect the reputation of Zuckerberg and other top executives.  Tavis McGinn, who was hired in 2017 to manage publicity of the Russia activity, quit when it became clear to him that executive reputations were more important to the Company than transparency.[17]

## IV.    FIDUCIARY DUTIES OF THE DEFENDANTS

56.    By reason of their positions as officers, directors, and/or fiduciaries of Facebook during the relevant period, and because of their ability to control the business and corporate affairs of the Company, the Defendants owed Facebook and its shareholders fiduciary obligations of good faith, loyalty, due care, and candor, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.

---

[16] Nicole Perlroth, Sheera Frenkel & Scott Shane, *Facebook Exit Hints at Dissent on Handling of Russian Troll*, The New York Times (Mar. 19, 2018), https://www.nytimes.com/2018/03/19/technology/facebook-alex-stamos.html.

[17] *Id.*

The Defendants were and are required to act in furtherance of the best interests Facebook and its stockholders so as to benefit all shareholders equally — not in furtherance of their personal interest or benefit.

57.     Each director and officer of the Company owes to Facebook and its shareholders the fiduciary duties to exercise good faith and diligence in the administration of the Company's affairs and in the use and preservation of its property and assets, and the highest obligations of fair dealing and candor.

58.     The Defendants, because of their positions of control and authority as directors and/or officers of Facebook, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Due to their positions with Facebook, each of the Defendants had knowledge of material non-public information regarding the Company.

## V.     DEFENDANTS' BREACHES OF FIDUCIARY DUTIES

59.     The Defendants either knew that they had failed to cause the Company to comply with the Consent Decree's requirement for effective protections of confidential user data or turned a blind eye to its failure.

60.     The Consent Decree by its own terms required that each director and officer me provided a copy of the Consent Decree itself.  Accordingly, each was aware of its requirements.

61.     By having such actual knowledge of the Consent Decree's requirements, each member of Facebook's Board became obligated to ensure that the Company implemented the requirements of the Consent Decree.

62.     Among the Consent Decree's requirements is that the Company "establish and implement, and thereafter maintain, a comprehensive privacy program."  Moreover, the Company was required, "prior to sharing of a user's nonpublic user information" with any third party, to (i) disclose the information that would be disclosed, (ii) disclose who it would be disclosed to, (iii) disclose that the disclosure was beyond what the user had permitted; and (iv) "obtain the user's affirmative express consent."

63.     The Consent Decree's requirements were clear and unambiguous and had been explicitly agreed to by the Company (likely with the express approval of the Board). Nevertheless, Facebook apparently worked on the "honor system," giving unfettered access to user data to any third party who purported to be pursuing an academic interest and promised to delete the user data at the conclusion of the purported academic study.  There was no apparent vetting, oversight, or independent confirmation that the user data was being used for the third party's stated purpose or that the data was or would ultimately be deleted or destroyed.  As detailed above, whistleblower Sandy Parakilas has confirmed that Facebook did nothing to control the use or misuse of user data after it was provided to third-parties in breach of the Consent Decree.

64.     Thus, Defendants caused Facebook to continue to give third parties, access to private user data, in violation of user privacy settings and in direct violation of the Consent Decree.

65.     Moreover, even after failing to implement appropriate data controls in the wake of the Consent Decree, Defendants failed to correct these deficiencies after being made aware of them. The Consent Decree requires Facebook to obtain "initial and biennial assessments and reports [regarding the efficacy of its privacy protocols] from a qualified, objective, independent third-party professional, who uses procedures and standards generally accepted in the profession."  These reports are required to:

A     Set forth the specific privacy controls that Respondent has implemented and   maintained during the reporting period;

B.     Explain how such privacy controls are appropriate to Respondent's size and complexity, the nature and scope of Respondent's activities, and the sensitivity of the covered information;

C.     Explain how the privacy controls that have been implemented meet or exceed the protection required by … this order; and

D.     Certify that the privacy controls are operating with sufficient effectiveness to provide reasonable assurance to protect the privacy of covered information and that the controls have so operated throughout the reporting period.

66.     These reports should have included an iterative process involving executive management and the Company's Audit Committee on the state of the Company's privacy protocols and any potential weaknesses therein.

67.     Thus, executive management and Facebook's Board would have been made aware *at least four times*, that it had failed to implement the Consent Decree and allowed third-party access to private user data in violation of those user's privacy settings.

68.     In addition, in 2016, Facebook's Chief Security Officer informed executives with reporting obligations to the Board that Facebook was inadequately policing its platforms.  He then uncovered Russia's use of the Facebook platform to interfere in the 2016 presidential election, his warnings disregarded.

## VI.     DEFENDANTS VIOLATED SECTION 14(a) OF THE EXCHANGE ACT AND SEC RULE 14a-9 BY CAUSING FACEBOOK TO FILE A MATERIALLY MISLEADING PROXY STATEMENT

69.     The Defendants violated Section 14(a) of the Exchange Act and SEC Rule 14a-9 by causing Facebook to issue proxy statements that failed to disclose the Cambridge Analytica privacy breach or the serious deficiencies in internal controls and procedures which resulted in that breach.  The Defendants' failure in this regard also constitutes a breach of their fiduciary duties.

70.     The Exchange Act mandates that publicly traded companies disclose material information to investors, and SEC guidance encourages disclosure of material information promptly, including disclosure relating to cybersecurity and data breaches.  Nonetheless, the Company did not mention the Cambridge Analytica data breach in any public filings or public statements prior to 2018.  In fact, Facebook made generalized and misleading statements in its 2017 Proxy Statement about the potential for breaches in user privacy without disclosing that such a (massive) breach had already occurred – unbeknownst to investors.  In addition, this filing certified that Facebook's internal controls were effective and that the Company complied with all applicable laws – including the Consent Decree.

71.     By failing to disclose the Cambridge Analytica data breach and failure of internal controls, the 2017 Proxy Statement violated Section 14(a) of the Exchange Act and SEC

Rule 14a-9.  In addition, the 2017 Proxy Statement omitted any disclosure regarding the Company's failure to appropriately address the Cambridge Analytica data breach and the fact that the Company was likely in violation of the Consent Decree.

72.     As such, the 2017 Proxy Statement misleadingly informed investors that the Company's internal controls were "effective" and provided "oversight of management" and Board accountability.  In reality, Facebook's management treated user data in a careless and cavalier manner, and the Company's protocols allowed the Board and senior management to escape accountability by failing to disclose the Cambridge Analytica data breach to the public markets.

73.     The misleading 2017 Proxy Statement thus withheld material information from the Company's investors, leading to the shareholders ill-informed decision to re-elect all of the Defendants despite their breaches of fiduciary duties and resultant harm to the Company's business and reputation.

## VII.     THE INSIDER TRADING DEFENDANTS SOLD SIGNIFICANT AMOUNTS OF FACEBOOK STOCK WHILE IN POSSESSION OF MATERIAL NON-PUBLIC INFORMATION

74.     In 2018, prior to news breaking of the Cambridge Analytica data breach, the Insider Trading Defendants sold $1.5 billion of Facebook stock at a time when investors did not realize the extent to which the Company's internal controls and policies were deficient in protecting the confidentiality and/or privacy of user data.  For example, Defendant Zuckerberg sold 5,423,000 shares of his Facebook holdings for over $978 million.  Defendant Sandberg sold 196,684 shares of her Facebook holdings for over $35 million, and Defendant Koum sold 2,485,347 of his Facebook holdings for over $442 million.[18]

75.     By trading while in possession of material, non-public information, the Insider Trading Defendants breached their fiduciary duties.

---

[18]  Charts detailing these insider trades are annexed hereto as Appendix A.

## VIII.  THE BOARD'S BREACHES OF FIDUCIARY DUTY HAVE CAUSED HARM TO THE COMPANY

76.     The Facebook / Cambridge Analytica data breach first came to light on March 16, 2018 when Facebook posted a statement announcing it was suspending Cambridge Analytica and Strategic Communication Laboratories from its platform. Facebook said its policies had been violated when Cambridge University scholar Aleksandr Kogan passed user data, obtained through a personality test app, to Cambridge Analytica.  Facebook also admitted that the issue came to its attention in 2015 and it subsequently removed Dr. Kogan's app from the site. It said it had demanded and received certification that the data had been destroyed — although it did not independently verify that this data had in fact been destroyed.

77.     Then, on March 17, 2018, a pair of blockbuster reports from the *New York Times* and the UK's *Observer* further explained the scope of the problem: Cambridge Analytica collected the data not only of the approximately 270,000 users who agreed to take Kogan's personality quiz but also their friends, thus harvesting information on tens of millions of people without their knowledge or permission.  These reports also indicated that the collected data had not been deleted or destroyed, and certain data files had been made available to the *New York Times*.[19]

78.     On March 20, 2018, the FTC announced that it was investigating whether the use of Facebook user data by Cambridge Analytica violated the Consent Decree.  The Company could face fines of $40,000 a day per violation if the agency finds that Facebook violated the Decree. According to David Vladeck, a former director of consumer protection at the FTC, "there are all sorts of obligations under the Consent Decree that may not have been honored

---

[19] *Facebook Leaves Its Users' Privacy Vulnerable*, The New York Times (ed. Mar. 19, 2018), https://www.nytimes.com/2018/03/19/opinion/facebook-cambridge-analytica-privacy.html.

here."[20] Wall Street analysts predict that the FTC could hit Facebook with a financial penalty of up to $2 billion.[21]

79.     In addition to the FTC, the New York attorney general, Eric T. Schneiderman, has recently announced that he was joining the Massachusetts attorney general, Maura Healey, in an investigation into whether Facebook had failed to protect the privacy of users – an investigation that has grown to include attorneys general from 37 states.[22]  In addition, the Company is facing liability for violations of a myriad of federal and state statutes, including violations of Sections 2511 (1)(a) and (1)(d) of the Electronic Communications Privacy Act, as well as state consumer protection statutes.

80.     Moreover, legislators have been severe in their criticism of the Company. Senators Amy Klobuchar (D., Minn.) and John Kennedy (R., La.) stated jointly that "the lack of oversight on how data is stored and how political advertisements are sold raises concerns about the integrity of American elections as well as privacy rights."[23] Ron Wyden (D., Ore.), wrote a letter to Mr. Zuckerberg demanding answers to a series of questions about media reports on how Cambridge Analytica used the Facebook data. Mr. Wyden said the incident calls into question a number of issues, including "the prudence and desirability of Facebook's business practices and the dangers of monetizing consumers' private information."[24] It is widely expected that Facebook will face significant new regulation.

81.     On March 22, 2018, the House Energy and Commerce Committee announced that it would summon Zuckerberg to testify regarding the data breach.  The day prior to this

---

[20] Celia Kang, *Facebook Faces Growing Pressure Over Data and Privacy Inquiries*, The New York Times (Mar. 20, 2018), https://www.nytimes.com/2018/03/20/business/ftc-facebook-privacy-investigation.html.

[21] https://www.cbsnews.com/news/facebook-could-face-billion-dollar-fine-wall-street-analysts-say/

[22] *Id.;* https://www.wsj.com/articles/attorneys-general-profoundly-concerned-over-facebook-user-data-1522090027

[23] Byron Tau & Deepa Seetharaman, *Facebook Is Pummeled by User-Data Blowback*, *supra,* https://www.wsj.com/articles/facebook-is-pummeled-by-user-data-blowback-1521561322?tesla=y.

[24] *Id.*

announcement, Zuckerberg publicly apologized for the data breach during a CNN interview, stating:

> I'm really sorry that this happened …. I wish we'd taken … steps earlier. That is probably the biggest mistake that we made here.[25]

82.     Indeed, Facebook had been planning to roll out a major new hardware product. This was slated to be a competitor to Google Home and Amazon's Echo in 2018.  Now, in light of this new scrutiny of Facebook's privacy policies, Facebook has delayed the release of this new product.[26]

83.     By failing to ensure that Facebook protect private user data and by failing to properly implement the requirements of the Consent Decree, Facebook's Board exposed the Company to significant harm.

## IX.     DERIVATIVE ALLEGATIONS

84.     Plaintiff brings this action derivatively to redress injuries suffered by the Company as a direct result of the breaches of fiduciary duty and other breaches by the Defendants.

85.     Plaintiff has owned Facebook stock continuously during the time of the wrongful course of conduct by the Defendants alleged herein and continues to hold Facebook stock.

86.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

87.     Facebook is named as a nominal defendant in this case solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.  Prosecution of this action, independent of the current Board, is in the best interest of the Company.

---

[25] Danielle Wiener-Bronner, *Mark Zuckerberg has regrets: 'I'm really sorry that this happened',* CNN Tech (Mar. 21, 2018), http://money.cnn.com/2018/03/21/technology/mark-zuckerberg-apology/index.html.

[26] https://www.bloomberg.com/news/articles/2018-03-28/facebook-is-said-to-delay-home-speaker-unveil-amid-data-crisis

X.    **DEMAND ON THE BOARD IS EXCUSED BECAUSE IT IS FUTILE**

    *A.    Demand is Futile Because the Directors are Liable for Their Wrongdoing*

    88.    As a result of the facts set forth herein, Plaintiff has not made any demand on the Board to institute this action since demand would be a futile and useless act because the Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.  The wrongful acts complained of herein involve multiple breaches by the Defendants of their fiduciary duties of loyalty, due care, and oversight.

    89.    Defendants adopted business policies and procedures for the sharing of user data which was in violation of the Consent Decree, as well as federal and state statutes, which prohibit the unauthorized sharing of such information without informed user consent.  Because of the illegality of these policies and procedures, the Defendants' decisions to share user data is not a valid exercise of business judgment and cannot be excused by the business judgment rule.

    90.    Indeed, the Defendants' conduct as described herein demonstrates a pattern of misconduct that could not have been the product of legitimate business judgment as it was based on intentional, reckless, and disloyal conduct.

    91.    As a majority of the Board faces a substantial likelihood of liability, they are self-interested in any potential litigation and cannot be presumed capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of shareholders of the Company.

    92.    Based on the foregoing, the Defendants face a sufficiently substantial likelihood of liability and accordingly, there is a reasonable doubt as to each Defendant's disinterestedness in deciding whether pursuing legal action would be in the Company's best interest. Accordingly, demand upon the Defendants is excused as being futile.

    *B.    Demand is Futile Because the Board Lacks Independence*

    93.    As an initial matter, there can be little doubt that Zuckerberg exerts extraordinary control over Facebook and its Board.  As noted in Fortune magazine, "the reality is that Mark Zuckerberg can do whatever he wants with Facebook because he controls more than 50%

of the votes …. He also controls the board of directors thanks the creative use of proxy votes from other co-founders."[27]

94.     Indeed, the Company and Board tout the Board's total lack of independence. The total control over the Company by Zuckerberg is laid plain in Facebook's most recent Proxy Statement, which reads in pertinent part:

> Because Mr. Zuckerberg controls a majority of our outstanding voting power, we are a "controlled company" under the corporate governance rules of the NASDAQ Stock Market ….  Therefore, we are not required to have a majority of our board of directors be independent, nor are we required to have a compensation committee or an independent nominating function.  In light of our status as a controlled company, our board of directors has determined not to have an independent nominating function and to have the full board of directors be directly responsible for nominating members of our board.

95.     Underscoring this lack of Board independence are the intertwining business interests, which make many of the Company's directors dependent upon the good graces of Zuckerberg.  For example, Defendant Andreessen is a co-founder and General Partner of Andreessen Horowitz, a venture capital firm.  Two of Andreessen Horowitz's portfolio companies (Instagram and Oculus VR) have been purchased by Facebook.  The purchase of Instagram alone *netted* Andreessen Horowitz almost $78 million.

96.     Andreessen admitted to the importance of his relationship with Facebook and Zuckerberg to Andreessen Horowitz's success in a May 18, 2015 New Yorker article.  In this article, Andreessen noted that his venture capital firm's biggest success occurred after it successfully added Facebook to the firm's portfolio in 2010.  According to Andreessen, the firm's relationship with Facebook made "Andreessen Horowitz … the talk of the town."  It is clear that if Andreessen were to fall out of Zuckerberg's good graces, he would suffer significant business harm.

97.     Similarly, Defendant Thiel has been a Partner of the venture capital firm Founders Fund since 2005.  Like Defendant Andreessen, Thiel touts his firm's relationship with Facebook and holds up Facebook as a primary example of how ensuring that "founders can

---

[27]  Mathew Ingram, *Mark Zuckerberg's Absolute Control Over Facebook Is Not New*, Fortune (Dec. 13, 2016), http://fortune.com/2016/12/13/zuckerberg-facebook-lawsuit/.

continue to run their business through voting control mechanisms" maintains a corporation's vibrancy by diminishing interference from financial backers.  Indeed, Thiel's high-profile relationship with Zuckerberg has greatly benefitted the Founders Fund – and the deterioration of that relationship that would result from Thiel's crossing Zuckerberg would similarly harm the Founders Fund.  According to the New York Times, Defendant Thiel donated $1.25 million to the Trump campaign, both directly and through intermediary "SuperPACs" in the immediate wake of the *Access Hollywood* tape scandal.[28]  Defendant Thiel is also a co-founder of Palantir Technologies, a privately held data analysis company. According to a co-founder of Cambridge Analytica, who testified recently before the U.K. Parliament, "There were senior Palantir employees that were also working on the Facebook data."[29]

98.     In addition, Defendant Hastings, as CEO and Chairman of Netflix, Inc. ("Netflix"), has significant business dealings with Facebook and Zuckerberg.  Netflix entered into a joint marketing initiative with Facebook in March 2013 called "Friends and Community." This initiative allowed Netflix to enjoy word-of-mouth marketing by allowing Facebook users to share data about their Netflix viewing habits with their Facebook friends.  Purportedly, the launch of the Friends and Community initiative resulted in Netflix's share price climbing 6% after announcement of the program.

99.     Defendant Desmond-Hellman also lacks independence from Zuckerberg due to their close business and personal relationships.  As Lead Independent Director, Desmond-Hellman also serves as a key liaison between Zuckerberg and the Company's Board.

---

[28] David Streitfeld, *Peter Thiel to Donate $1.25 Million in Support of Donald Trump*, New York Times (October 15, 2016), https://www.nytimes.com/2016/10/16/technology/peter-thiel-donald-j-trump.html.

[29] Nicholas Confessore and Matthew Rosenberg, *Spy Contractor's Idea Helped Cambridge Analytica Harvest Facebook Data*, New York Times (March 27, 2018), https://www.nytimes.com/2018/03/27/us/cambridge-analytica-palantir.html.

## CAUSES OF ACTION

### COUNT I
### (Against Defendants for Breach of Fiduciary Duty)

100.    Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth herein.

101.    The Defendants owed and owe Facebook fiduciary obligations, including obligations of good faith, fair dealing, loyalty, and care.  Among other things, the Defendants owed a fiduciary duty to Facebook to supervise and monitor its uses of confidential and/or private user data.

102.    The Defendants breached their duties of loyalty, care, and good faith by: (i) failing to implement and enforce an effective system of internal controls and procedures with respect to the use and sharing of confidential and/or private user data; (ii) failing to exercise their oversight duties by not monitoring the Company's compliance with the Consent Decree, as well as federal and state laws regarding the unauthorized disclosure of confidential and/or private user data; and (iii) failing to fully, fairly, and timely disclose the scope of the data breach involving Cambridge Analytica.

103.    By reason of the foregoing, Facebook was damaged.

### COUNT II
### (Against the Insider Trading Defendants for
### Insider Trading and Misappropriation of Information)

104.    Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set for the herein.

105.    At the time of the stock sales described herein, the Insider Trading Defendants knew or recklessly disregarded the information described in this Complaint regarding the Cambridge Analytica data breach and sold Facebook common stock on the basis of that information.

106.    The information described above was non-pubic information concerning the Company's irresponsible and illegal conduct surrounding the dissemination of confidential

and/or private user data.  This information was proprietary as to Facebook, but the Defendants used this information for their own benefit.

107.    The Insider Trading Defendants sale of Facebook common stock while in possession of material, non-public, proprietary information was a breach of their fiduciary duties of loyalty and good faith.  As such, the Company is entitled to the disgorgement of all profits the Insider Trading Defendants derived from breaches of their fiduciary duties.

## COUNT IIII
### (Against Defendants for Unjust Enrichment)

108.    Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set for the herein.

109.    During the relevant period, Defendants received bonuses, stock options, stock, or similar compensation from Facebook that was tied to the Company's financial performance.  This compensation was unjust in light of the Defendants' bad faith conduct.

110.    Plaintiff, as a stockholder and representative of Facebook, seeks restitution from Defendants and seeks a Court order disgorging all compensation obtained by the Defendants due to the wrongful acts alleged herein.

## COUNT IV
### (Against Defendants for Violations of
### Section 14(a) of the Exchange Act and SEC Rule 14a-9)

111.    Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set for the herein, except to the extent those allegations plead knowledge or reckless conduct by the Defendants.  This claim is based solely on negligence, not on any allegations of reckless or knowing conduct by or on behalf of the Defendants.  Plaintiff specifically disclaims any allegations of reliance upon any allegations of, or reference to, fraud, scienter, or recklessness with regard to this claim.

112.    The Defendants negligently issued, caused to be issued and participated in the issuance of materially misleading written statements to stockholders in the 2017 Proxy Statement.  The 2017 Proxy Statement contained proposals urging Facebook's stockholders to re-elect the members of the Board, while misleadingly touting the efficacy of the Company's

1  internal controls and compliance with federal and state laws – including the Consent Decree.

2  The 2017 Proxy also failed to disclose the Cambridge Analytica data breach and the fact that the

3  Company faced significant reputational damage and legal liabilities relating to the data breach.

4  As such, the 2017 Proxy Statement was materially false and misleading.

5       113.    By reason of the conduct alleged herein, the Defendants misled or deceived

6  Facebook stockholders by falsely portraying material facts concerning the efficacy of Board

7  oversight and the Company's internal controls.  The false statements and material omissions

8  were material because there is a substantial likelihood that a reasonable investor would consider

9  this information important in deciding how to vote on the matters contained in the 2017 Proxy,

10  which were submitted for vote at the 2017 annual meeting.

11       114.    Plaintiff, on behalf of Facebook, seeks injunctive and equitable relief because the

12  conduct of the Defendants interfered with stockholder voting rights.  Plaintiff does not seek any

13  monetary damage for the proxy law violations.

14  **COUNT V**

**(Against Insider Trading Defendants for Violations of**
15  **Section 25402 of the California Corporations Code)**

16       115.    Plaintiff incorporates by reference and realleges each of the foregoing allegations

17  as though fully set for the herein.

18       116.    At the time the Insider Trading Defendants sold their Facebook common stock,

19  these defendants had access to highly material non-public information regarding the Company,

20  including information regarding the Cambridge Analytica data breach.  The Insider Trading

21  Defendants received millions of dollars as a result of these sales using information that was an

22  asset of and proprietary to Facebook.

23       117.    Had information regarding the Cambridge Analytica data breach and the

24  Company's ineffective internal controls been publicly available, it would have significantly

25  reduced the market price of Facebook shares at the time that the Insider Trading Defendants

26  sold their stock in the Company.

27       118.    Pursuant to California Corporations Code § 25502.5, each of the Insider Trading

28  Defendants is liable to Facebook for damages in an amount up to three times the difference

between the price at which their Facebook shares were sold and the market value the stock would have sold had the insider information known to the Insider Trading Defendants been publicly disseminated.

**COUNT VI**
**(Against Defendants for Violations of**
**Section 25403 of the California Corporations Code)**

119.    Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set for the herein.

120.    The Defendants, through their positions, possessed control and influence over the Insider Trading Defendants' sale of Facebook common stock in violation of the California Corporations Code.  Defendants are thus statutorily liable to the same extent as the Insider Trading Defendants under Californian Corporations Code § 25403.

121.    Pursuant to California Corporations Code §§ 25403 and 25502.5, each of the Defendants is liable to Facebook for damages in an amount up to three times the difference between the price at which the Insider Trading Defendants' Facebook shares were sold and the market value the stock would have sold had the insider information known to the Insider Trading Defendants been publicly disseminated.

**COUNT VII**
**(Against Defendants for Contribution and Indemnification)**

122.    Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set for the herein.

123.    This claim is brought derivatively on behalf of the Company against the Defendants.

124.    Facebook is named as a defendant in a putative shareholder class action filed in this District on March 20, 2018, asserting claims under the federal securities laws for, among other things, false and misleading statements relating to the Company's user privacy practices. In the event the Company is found liable for violations of the federal securities laws, this liability will be predicated on the intentional, knowing, or reckless acts or omissions by the Defendants, some or all of which are described herein.  As such, the Company is entitled to

1  receive contribution from the Defendants in connection with the securities fraud class action

2  against Facebook pending in this District.

3  **PRAYER FOR RELIEF**

4      **WHEREFORE**, Plaintiff demands judgment as follows:

5      A.    Directing Defendants to account to Facebook for all damages sustained or to be

6  sustained by the Company by reason of the wrongs alleged herein;

7      B.    Directing Facebook to take all necessary actions to reform its corporate

8  governance and internal procedures to comply with applicable laws and protect the Company

9  and its shareholders from a recurrence of the events described herein;

10     C.    Awarding to Facebook restitution from the Insider Trading Defendants and

11 ordering disgorgement of all profits from illegal insider stock trades.

12     D.    Awarding Plaintiff the costs and disbursements of this action, including

13 reasonable attorneys' and experts' fees and expenses; and

14     E.    Granting such other and further relief as the Court may deem just and proper.

15 **JURY DEMAND**

16     Plaintiff demands a trial by jury.

17 DATED: April 2, 2018                  **BERMAN TABACCO**

18

19                             By: _____

20                                   Joseph J. Tabacco, Jr.

21                           Daniel E. Barenbaum

                            A. Chowning Poppler

22                           44 Montgomery Street, Suite 650

                            San Francisco, CA  94104

23                           Telephone: (415) 433-3200

                            Facsimile:  (415) 433-6382

24                           Email: jtabacco@bermantabacco.com

25                                  dbarenbaum@bermantabacco.com

                                 cpoppler@bermantabacco.com

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Nathaniel L. Orenstein
Mark Delaney
**BERMAN TABACCO**
One Liberty Square
Boston, MA 02109
Telephone: (617) 542-8300
Facsimile: (617) 542-1194
Email: norenstein@bermantabacco.com
　　　　mdelaney@bermantabacco.com

Ira N. Richards
**SCHNADER HARRISON SEGAL &
LEWIS LLP**
1600 Market Street
Suite 3600
Philadelphia, PA 19103
Telephone: (215) 751-2000
Facsimile: (215) 751-2205
Email: irichards@schnader.com

*Counsel for Plaintiff Gloria Stricklin Trust*

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| GLORIA STRICKLIN TRUST, derivatively on behalf of Facebook, Inc., | Case No. |
| Plaintiff | **VERIFICATION/DECLARATION** |
| v. | |
| MARK ZUCKERBERG, SHERYL K. SANDBERG, MARC L. ANDREESSEN, PETER A. THIEL, REED HASTINGS, ERSKINE B. BOWLES, SUSAN D. DESMOND-HELLMAN, and JAN KOUM, | |
| Defendants, | |
| and | |
| FACEBOOK, INC., | |
| Nominal Defendant. | |

I, Gloria E. Stricklin, as Trustee of the Gloria Stricklin Trust, pursuant to 28 U.S.C. §1746, as follows:

    1.    Pursuant to the requirements of Rule 23.1 (b) of the Federal Rules of Civil Procedure, I hereby declare that I am a shareholder of Facebook, Inc. and have been such at all relevant times.

    2.    I further declare that the facts as alleged in the accompanying Complaint are true and correct to the best of my knowledge, information and belief.

    3.    I declare under penalty of perjury that the foregoing is true and correct.

April 2, 2018

/s/Gloria E. Stricklin
Gloria E. Stricklin

# Appendix A

## APPENDIX A
### Insider Trades

### Koum, Jan (Director)

| Security | Trade Date | Number of Shares | Price | Gross Proceeds |
|---|---|---|---|---|
| Class A Common Stock | 2/20/2018 | (301,670) | $177.4104 | $53,519,395.37 |
| Class A Common Stock | 2/20/2018 | (580,736) | $176.5977 | $102,556,641.91 |
| Class A Common Stock | 2/20/2018 | (371,500) | $175.6494 | $65,253,752.10 |
| Class A Common Stock | 2/15/2018 | (1,231,441) | $179.5200 | $221,068,288.32 |
| **Totals (Koum):** | | **(2,485,347)** | | **$442,398,077.70** |

### Sandberg, Sheryl (Chief Operating Officer | Director)

| Security | Trade Date | Number of Shares | Price | Gross Proceeds |
|---|---|---|---|---|
| Class A Common Stock | 3/15/2018 | (26,134) | $183.5057 | $4,795,737.96 |
| Class A Common Stock | 3/15/2018 | (28,866) | $182.7890 | $5,276,387.27 |
| Class A Common Stock | 3/2/2018 | (3,484) | $176.4824 | $614,864.68 |
| Class A Common Stock | 3/2/2018 | (22,236) | $175.4910 | $3,902,217.88 |
| Class A Common Stock | 3/2/2018 | (11,080) | $174.5121 | $1,933,594.07 |
| Class A Common Stock | 3/2/2018 | (18,200) | $173.6200 | $3,159,884.00 |
| Class A Common Stock | 2/15/2018 | (8,185) | $179.5200 | $1,469,371.20 |
| Class A Common Stock | 2/15/2018 | (6,461) | $179.5200 | $1,159,878.72 |
| Class A Common Stock | 2/15/2018 | (17,038) | $179.5200 | $3,058,661.76 |
| Class A Common Stock | 2/14/2018 | (12,875) | $179.3158 | $2,308,690.93 |
| Class A Common Stock | 2/14/2018 | (10,500) | $178.3241 | $1,872,403.05 |
| Class A Common Stock | 2/14/2018 | (12,525) | $177.1428 | $2,218,713.57 |
| Class A Common Stock | 2/14/2018 | (6,300) | $176.5354 | $1,112,173.02 |
| Class A Common Stock | 2/14/2018 | (10,900) | $174.9736 | $1,907,212.24 |
| Class A Common Stock | 2/14/2018 | (1,900) | $173.4588 | $329,571.72 |
| **Totals (Sandberg):** | | **(196,684)** | | **$35,119,362.07** |

### Zuckerberg, Mark (Chief Executive Officer, Chairman of the Board |Director)

| Security | Trade Date | Number of Shares | Price | Gross Proceeds |
|---|---|---|---|---|
| Class A Common Stock | 3/16/2018 | (58,195) | $184.7696 | $10,752,666.87 |
| Class A Common Stock | 3/16/2018 | (69,305) | $184.3106 | $12,773,646.13 |
| Class A Common Stock | 3/16/2018 | (40,760) | $184.7805 | $7,531,653.18 |
| Class A Common Stock | 3/16/2018 | (51,740) | $184.3179 | $9,536,608.15 |
| Class A Common Stock | 3/15/2018 | (2,610) | $183.5884 | $479,165.72 |
| Class A Common Stock | 3/15/2018 | (5,790) | $182.9273 | $1,059,149.07 |
| Class A Common Stock | 3/15/2018 | (2,600) | $183.6135 | $477,395.10 |
| Class A Common Stock | 3/15/2018 | (6,400) | $182.9366 | $1,170,794.24 |
| Class A Common Stock | 3/15/2018 | (3,300) | $183.5383 | $605,676.39 |
| Class A Common Stock | 3/15/2018 | (4,700) | $182.8330 | $859,315.10 |

# APPENDIX A
## Insider Trades

| Security | Trade Date | Number of Shares | Price | Gross Proceeds |
|---|---|---|---|---|
| Class A Common Stock | 3/15/2018 | (57,120) | $183.5140 | $10,482,319.68 |
| Class A Common Stock | 3/15/2018 | (70,380) | $182.8100 | $12,866,167.80 |
| Class A Common Stock | 3/15/2018 | (42,146) | $183.5057 | $7,734,031.23 |
| Class A Common Stock | 3/15/2018 | (50,354) | $182.8076 | $9,205,093.89 |
| Class A Common Stock | 3/14/2018 | (4,010) | $183.7210 | $736,721.21 |
| Class A Common Stock | 3/14/2018 | (4,390) | $182.6240 | $801,719.36 |
| Class A Common Stock | 3/14/2018 | (942) | $184.0334 | $173,359.46 |
| Class A Common Stock | 3/14/2018 | (4,100) | $183.5156 | $752,413.96 |
| Class A Common Stock | 3/14/2018 | (3,958) | $182.5469 | $722,520.63 |
| Class A Common Stock | 3/14/2018 | (300) | $184.0467 | $55,214.01 |
| Class A Common Stock | 3/14/2018 | (4,000) | $183.5940 | $734,376.00 |
| Class A Common Stock | 3/14/2018 | (3,700) | $182.5476 | $675,426.12 |
| Class A Common Stock | 3/14/2018 | (16,968) | $184.0118 | $3,122,312.22 |
| Class A Common Stock | 3/14/2018 | (55,967) | $183.4711 | $10,268,327.05 |
| Class A Common Stock | 3/14/2018 | (54,565) | $182.5391 | $9,960,245.99 |
| Class A Common Stock | 3/14/2018 | (14,636) | $183.9882 | $2,692,851.30 |
| Class A Common Stock | 3/14/2018 | (39,668) | $183.4088 | $7,275,460.28 |
| Class A Common Stock | 3/14/2018 | (38,196) | $182.5204 | $6,971,549.20 |
| Class A Common Stock | 3/13/2018 | (6,882) | $185.5838 | $1,277,187.71 |
| Class A Common Stock | 3/13/2018 | (11,998) | $184.7779 | $2,216,965.24 |
| Class A Common Stock | 3/13/2018 | (17,174) | $183.9100 | $3,158,470.34 |
| Class A Common Stock | 3/13/2018 | (29,682) | $182.6152 | $5,420,384.37 |
| Class A Common Stock | 3/13/2018 | (61,764) | $181.9615 | $11,238,670.09 |
| Class A Common Stock | 3/13/2018 | (5,703) | $185.5784 | $1,058,353.62 |
| Class A Common Stock | 3/13/2018 | (8,736) | $184.7237 | $1,613,746.24 |
| Class A Common Stock | 3/13/2018 | (12,745) | $183.8776 | $2,343,520.01 |
| Class A Common Stock | 3/13/2018 | (25,662) | $182.5314 | $4,684,120.79 |
| Class A Common Stock | 3/13/2018 | (39,654) | $181.9159 | $7,213,693.10 |
| Class A Common Stock | 3/12/2018 | (37,974) | $185.6028 | $7,048,080.73 |
| Class A Common Stock | 3/12/2018 | (89,526) | $184.9565 | $16,558,415.62 |
| Class A Common Stock | 3/12/2018 | (36,241) | $185.5238 | $6,723,568.04 |
| Class A Common Stock | 3/12/2018 | (56,259) | $184.9030 | $10,402,457.88 |
| Class A Common Stock | 3/9/2018 | (5,300) | $184.9411 | $980,187.83 |
| Class A Common Stock | 3/9/2018 | (3,100) | $184.0000 | $570,400.00 |
| Class A Common Stock | 3/9/2018 | (3,300) | $185.3174 | $611,547.42 |
| Class A Common Stock | 3/9/2018 | (81,763) | $184.9082 | $15,118,649.16 |
| Class A Common Stock | 3/9/2018 | (42,437) | $183.9401 | $7,805,866.02 |
| Class A Common Stock | 3/9/2018 | (4,485) | $185.2872 | $831,013.09 |
| Class A Common Stock | 3/9/2018 | (58,521) | $184.8903 | $10,819,965.25 |
| Class A Common Stock | 3/9/2018 | (29,494) | $183.9145 | $5,424,374.26 |
| Class A Common Stock | 3/8/2018 | (700) | $184.0421 | $128,829.47 |
| Class A Common Stock | 3/8/2018 | (2,100) | $183.2005 | $384,721.05 |
| Class A Common Stock | 3/8/2018 | (5,600) | $182.1983 | $1,020,310.48 |
| Class A Common Stock | 3/8/2018 | (17,163) | $183.8567 | $3,155,532.54 |
| Class A Common Stock | 3/8/2018 | (36,710) | $182.7412 | $6,708,429.45 |
| Class A Common Stock | 3/8/2018 | (73,627) | $182.1329 | $13,409,899.03 |
| Class A Common Stock | 3/8/2018 | (13,092) | $183.8115 | $2,406,460.16 |

# APPENDIX A
## Insider Trades

| Security | Trade Date | Number of Shares | Price | Gross Proceeds |
|---|---|---|---|---|
| Class A Common Stock | 3/8/2018 | (25,064) | $182.7593 | $4,580,679.10 |
| Class A Common Stock | 3/8/2018 | (54,344) | $182.1316 | $9,897,759.67 |
| Class A Common Stock | 3/7/2018 | (22,781) | $183.5253 | $4,180,889.86 |
| Class A Common Stock | 3/7/2018 | (21,590) | $182.7483 | $3,945,535.80 |
| Class A Common Stock | 3/7/2018 | (25,683) | $181.6701 | $4,665,833.18 |
| Class A Common Stock | 3/7/2018 | (28,070) | $180.6818 | $5,071,738.13 |
| Class A Common Stock | 3/7/2018 | (19,266) | $179.5193 | $3,458,618.83 |
| Class A Common Stock | 3/7/2018 | (10,110) | $178.7595 | $1,807,258.55 |
| Class A Common Stock | 3/7/2018 | (17,746) | $183.4958 | $3,256,316.47 |
| Class A Common Stock | 3/7/2018 | (14,600) | $182.6832 | $2,667,174.72 |
| Class A Common Stock | 3/7/2018 | (18,354) | $181.6478 | $3,333,963.72 |
| Class A Common Stock | 3/7/2018 | (19,000) | $180.6881 | $3,433,073.90 |
| Class A Common Stock | 3/7/2018 | (14,400) | $179.5805 | $2,585,959.20 |
| Class A Common Stock | 3/7/2018 | (8,400) | $178.7554 | $1,501,545.36 |
| Class A Common Stock | 3/6/2018 | (1,200) | $182.2583 | $218,709.96 |
| Class A Common Stock | 3/6/2018 | (28,003) | $181.6809 | $5,087,610.24 |
| Class A Common Stock | 3/6/2018 | (50,649) | $180.6427 | $9,149,372.11 |
| Class A Common Stock | 3/6/2018 | (47,648) | $179.7348 | $8,564,003.75 |
| Class A Common Stock | 3/6/2018 | (1,490) | $182.2221 | $271,510.93 |
| Class A Common Stock | 3/6/2018 | (21,388) | $181.6404 | $3,884,924.88 |
| Class A Common Stock | 3/6/2018 | (36,552) | $180.6023 | $6,601,375.27 |
| Class A Common Stock | 3/6/2018 | (33,070) | $179.7218 | $5,943,399.93 |
| Class A Common Stock | 3/5/2018 | (4,000) | $181.0275 | $724,110.00 |
| Class A Common Stock | 3/5/2018 | (56,204) | $180.4681 | $10,143,029.09 |
| Class A Common Stock | 3/5/2018 | (18,928) | $179.6271 | $3,399,981.75 |
| Class A Common Stock | 3/5/2018 | (9,392) | $178.3785 | $1,675,330.87 |
| Class A Common Stock | 3/5/2018 | (21,159) | $177.3920 | $3,753,437.33 |
| Class A Common Stock | 3/5/2018 | (17,817) | $176.5469 | $3,145,536.12 |
| Class A Common Stock | 3/5/2018 | (1,200) | $181.0560 | $217,267.20 |
| Class A Common Stock | 3/5/2018 | (39,432) | $180.5252 | $7,118,469.69 |
| Class A Common Stock | 3/5/2018 | (15,949) | $179.7159 | $2,866,288.89 |
| Class A Common Stock | 3/5/2018 | (7,119) | $178.4443 | $1,270,344.97 |
| Class A Common Stock | 3/5/2018 | (14,800) | $177.3944 | $2,625,437.12 |
| Class A Common Stock | 3/5/2018 | (14,000) | $176.5458 | $2,471,641.20 |
| Class A Common Stock | 3/2/2018 | (300) | $177.0833 | $53,124.99 |
| Class A Common Stock | 3/2/2018 | (11,072) | $176.3910 | $1,953,001.15 |
| Class A Common Stock | 3/2/2018 | (56,678) | $175.4589 | $9,944,659.53 |
| Class A Common Stock | 3/2/2018 | (26,100) | $174.5257 | $4,555,120.77 |
| Class A Common Stock | 3/2/2018 | (33,350) | $173.5871 | $5,789,129.79 |
| Class A Common Stock | 3/2/2018 | (300) | $177.0900 | $53,127.00 |
| Class A Common Stock | 3/2/2018 | (10,220) | $176.4224 | $1,803,036.93 |
| Class A Common Stock | 3/2/2018 | (61,979) | $175.3922 | $10,870,633.16 |
| Class A Common Stock | 3/2/2018 | (8,300) | $174.4131 | $1,447,628.73 |
| Class A Common Stock | 3/2/2018 | (11,701) | $173.5466 | $2,030,668.77 |
| Class A Common Stock | 3/1/2018 | (640) | $179.0466 | $114,589.82 |
| Class A Common Stock | 3/1/2018 | (2,160) | $177.9768 | $384,429.89 |
| Class A Common Stock | 3/1/2018 | (1,900) | $177.2800 | $336,832.00 |

## APPENDIX A
## Insider Trades

| Security | Trade Date | Number of Shares | Price | Gross Proceeds |
|---|---|---|---|---|
| Class A Common Stock | 3/1/2018 | (2,600) | $176.0169 | $457,643.94 |
| Class A Common Stock | 3/1/2018 | (1,100) | $175.2491 | $192,774.01 |
| Class A Common Stock | 3/1/2018 | (500) | $179.0720 | $89,536.00 |
| Class A Common Stock | 3/1/2018 | (1,400) | $178.3079 | $249,631.06 |
| Class A Common Stock | 3/1/2018 | (2,800) | $177.5057 | $497,015.96 |
| Class A Common Stock | 3/1/2018 | (2,300) | $176.2939 | $405,475.97 |
| Class A Common Stock | 3/1/2018 | (2,000) | $175.4565 | $350,913.00 |
| Class A Common Stock | 3/1/2018 | (100) | $179.1500 | $17,915.00 |
| Class A Common Stock | 3/1/2018 | (1,000) | $178.6820 | $178,682.00 |
| Class A Common Stock | 3/1/2018 | (3,110) | $177.5659 | $552,229.95 |
| Class A Common Stock | 3/1/2018 | (1,800) | $176.3161 | $317,368.98 |
| Class A Common Stock | 3/1/2018 | (1,990) | $175.5253 | $349,295.35 |
| Class A Common Stock | 3/1/2018 | (1,300) | $179.8477 | $233,802.01 |
| Class A Common Stock | 3/1/2018 | (10,800) | $178.9037 | $1,932,159.96 |
| Class A Common Stock | 3/1/2018 | (33,637) | $177.8752 | $5,983,188.10 |
| Class A Common Stock | 3/1/2018 | (27,234) | $177.1312 | $4,823,991.10 |
| Class A Common Stock | 3/1/2018 | (40,198) | $175.9982 | $7,074,775.64 |
| Class A Common Stock | 3/1/2018 | (14,331) | $175.2523 | $2,511,540.71 |
| Class A Common Stock | 3/1/2018 | (600) | $179.8733 | $107,923.98 |
| Class A Common Stock | 3/1/2018 | (7,840) | $179.0141 | $1,403,470.54 |
| Class A Common Stock | 3/1/2018 | (21,141) | $177.9807 | $3,762,689.98 |
| Class A Common Stock | 3/1/2018 | (23,162) | $177.2413 | $4,105,262.99 |
| Class A Common Stock | 3/1/2018 | (26,557) | $176.0592 | $4,675,604.17 |
| Class A Common Stock | 3/1/2018 | (13,200) | $175.3678 | $2,314,854.96 |
| Class A Common Stock | 2/28/2018 | (2,700) | $182.3452 | $492,332.04 |
| Class A Common Stock | 2/28/2018 | (4,007) | $181.6353 | $727,812.65 |
| Class A Common Stock | 2/28/2018 | (1,220) | $180.1543 | $219,788.25 |
| Class A Common Stock | 2/28/2018 | (473) | $178.6834 | $84,517.25 |
| Class A Common Stock | 2/28/2018 | (2,500) | $182.3860 | $455,965.00 |
| Class A Common Stock | 2/28/2018 | (4,587) | $181.6775 | $833,354.69 |
| Class A Common Stock | 2/28/2018 | (1,400) | $180.2050 | $252,287.00 |
| Class A Common Stock | 2/28/2018 | (513) | $178.7347 | $91,690.90 |
| Class A Common Stock | 2/28/2018 | (2,525) | $182.3432 | $460,416.58 |
| Class A Common Stock | 2/28/2018 | (3,900) | $181.6490 | $708,431.10 |
| Class A Common Stock | 2/28/2018 | (1,100) | $180.2350 | $198,258.50 |
| Class A Common Stock | 2/28/2018 | (475) | $178.7205 | $84,892.24 |
| Class A Common Stock | 2/28/2018 | (2,800) | $182.7807 | $511,785.96 |
| Class A Common Stock | 2/28/2018 | (64,584) | $182.1070 | $11,761,198.49 |
| Class A Common Stock | 2/28/2018 | (32,808) | $181.4623 | $5,953,415.14 |
| Class A Common Stock | 2/28/2018 | (18,968) | $180.1772 | $3,417,601.13 |
| Class A Common Stock | 2/28/2018 | (8,340) | $178.7068 | $1,490,414.71 |
| Class A Common Stock | 2/28/2018 | (3,400) | $182.7041 | $621,193.94 |
| Class A Common Stock | 2/28/2018 | (49,471) | $182.0677 | $9,007,071.19 |
| Class A Common Stock | 2/28/2018 | (21,709) | $181.3715 | $3,937,393.89 |
| Class A Common Stock | 2/28/2018 | (12,200) | $180.1273 | $2,197,553.06 |
| Class A Common Stock | 2/28/2018 | (5,720) | $178.6855 | $1,022,081.06 |
| Class A Common Stock | 2/27/2018 | (900) | $184.5744 | $166,116.96 |

**APPENDIX A**
**Insider Trades**

| Security | Trade Date | Number of Shares | Price | Gross Proceeds |
|---|---|---|---|---|
| Class A Common Stock | 2/27/2018 | (35,623) | $183.8542 | $6,549,438.17 |
| Class A Common Stock | 2/27/2018 | (53,210) | $182.9343 | $9,733,934.10 |
| Class A Common Stock | 2/27/2018 | (37,767) | $182.0902 | $6,877,000.58 |
| Class A Common Stock | 2/27/2018 | (400) | $184.5700 | $73,828.00 |
| Class A Common Stock | 2/27/2018 | (26,669) | $183.9030 | $4,904,509.11 |
| Class A Common Stock | 2/27/2018 | (39,523) | $182.9557 | $7,230,958.13 |
| Class A Common Stock | 2/27/2018 | (25,908) | $182.0866 | $4,717,499.63 |
| Class A Common Stock | 2/26/2018 | (5,900) | $185.4402 | $1,094,097.18 |
| Class A Common Stock | 2/26/2018 | (96,054) | $184.7340 | $17,744,439.64 |
| Class A Common Stock | 2/26/2018 | (25,546) | $184.0579 | $4,701,943.11 |
| Class A Common Stock | 2/26/2018 | (5,416) | $185.4171 | $1,004,219.01 |
| Class A Common Stock | 2/26/2018 | (72,443) | $184.7040 | $13,380,511.87 |
| Class A Common Stock | 2/26/2018 | (14,641) | $183.9772 | $2,693,610.19 |
| Class A Common Stock | 2/23/2018 | (30,846) | $182.9089 | $5,642,007.93 |
| Class A Common Stock | 2/23/2018 | (49,921) | $182.0920 | $9,090,214.73 |
| Class A Common Stock | 2/23/2018 | (35,833) | $181.2519 | $6,494,799.33 |
| Class A Common Stock | 2/23/2018 | (10,900) | $180.2267 | $1,964,471.03 |
| Class A Common Stock | 2/23/2018 | (19,915) | $182.9340 | $3,643,130.61 |
| Class A Common Stock | 2/23/2018 | (34,964) | $182.1698 | $6,369,384.89 |
| Class A Common Stock | 2/23/2018 | (28,821) | $181.2932 | $5,225,051.32 |
| Class A Common Stock | 2/23/2018 | (8,800) | $180.2089 | $1,585,838.32 |
| Class A Common Stock | 2/22/2018 | (2,100) | $179.8377 | $377,659.17 |
| Class A Common Stock | 2/22/2018 | (3,500) | $179.0542 | $626,689.70 |
| Class A Common Stock | 2/22/2018 | (2,800) | $178.2914 | $499,215.92 |
| Class A Common Stock | 2/22/2018 | (32,566) | $179.7975 | $5,855,285.39 |
| Class A Common Stock | 2/22/2018 | (65,795) | $178.9516 | $11,774,120.52 |
| Class A Common Stock | 2/22/2018 | (29,139) | $178.1500 | $5,191,112.85 |
| Class A Common Stock | 2/22/2018 | (25,777) | $179.7782 | $4,634,142.66 |
| Class A Common Stock | 2/22/2018 | (45,073) | $178.9453 | $8,065,601.51 |
| Class A Common Stock | 2/22/2018 | (21,650) | $178.1707 | $3,857,395.66 |
| Class A Common Stock | 2/21/2018 | (200) | $181.0650 | $36,213.00 |
| Class A Common Stock | 2/21/2018 | (2,700) | $180.3337 | $486,900.99 |
| Class A Common Stock | 2/21/2018 | (2,200) | $179.2995 | $394,458.90 |
| Class A Common Stock | 2/21/2018 | (1,700) | $178.4194 | $303,312.98 |
| Class A Common Stock | 2/21/2018 | (1,600) | $176.8735 | $282,997.60 |
| Class A Common Stock | 2/21/2018 | (14,399) | $180.8002 | $2,603,342.08 |
| Class A Common Stock | 2/21/2018 | (37,249) | $180.1081 | $6,708,846.62 |
| Class A Common Stock | 2/21/2018 | (40,904) | $178.9892 | $7,321,374.24 |
| Class A Common Stock | 2/21/2018 | (14,421) | $178.2019 | $2,569,849.60 |
| Class A Common Stock | 2/21/2018 | (20,527) | $176.9389 | $3,632,024.80 |
| Class A Common Stock | 2/21/2018 | (11,916) | $180.7430 | $2,153,733.59 |
| Class A Common Stock | 2/21/2018 | (27,523) | $180.0341 | $4,955,078.53 |
| Class A Common Stock | 2/21/2018 | (28,682) | $178.9320 | $5,132,127.62 |
| Class A Common Stock | 2/21/2018 | (9,174) | $178.1222 | $1,634,093.06 |
| Class A Common Stock | 2/21/2018 | (15,205) | $176.9175 | $2,690,030.59 |
| Class A Common Stock | 2/20/2018 | (30,743) | $177.4187 | $5,454,383.09 |
| Class A Common Stock | 2/20/2018 | (57,651) | $176.6324 | $10,183,034.49 |

# APPENDIX A
## Insider Trades

| Security | Trade Date | Number of Shares | Price | Gross Proceeds |
|---|---|---|---|---|
| Class A Common Stock | 2/20/2018 | (39,106) | $175.6746 | $6,869,930.91 |
| Class A Common Stock | 2/20/2018 | (21,648) | $177.4202 | $3,840,792.49 |
| Class A Common Stock | 2/20/2018 | (40,663) | $176.6435 | $7,182,854.64 |
| Class A Common Stock | 2/20/2018 | (30,189) | $175.6975 | $5,304,131.83 |
| Class A Common Stock | 2/16/2018 | (700) | $179.5243 | $125,667.01 |
| Class A Common Stock | 2/16/2018 | (3,600) | $178.7918 | $643,650.48 |
| Class A Common Stock | 2/16/2018 | (1,700) | $177.8888 | $302,410.96 |
| Class A Common Stock | 2/16/2018 | (2,400) | $177.0367 | $424,888.08 |
| Class A Common Stock | 2/16/2018 | (300) | $179.6800 | $53,904.00 |
| Class A Common Stock | 2/16/2018 | (3,600) | $178.8794 | $643,965.84 |
| Class A Common Stock | 2/16/2018 | (2,200) | $178.1541 | $391,939.02 |
| Class A Common Stock | 2/16/2018 | (2,900) | $177.0914 | $513,565.06 |
| Class A Common Stock | 2/16/2018 | (100) | $179.7800 | $17,978.00 |
| Class A Common Stock | 2/16/2018 | (2,107) | $179.0808 | $377,323.25 |
| Class A Common Stock | 2/16/2018 | (2,900) | $178.4266 | $517,437.14 |
| Class A Common Stock | 2/16/2018 | (2,893) | $177.1733 | $512,562.36 |
| Class A Common Stock | 2/16/2018 | (5,100) | $179.6408 | $916,168.08 |
| Class A Common Stock | 2/16/2018 | (53,003) | $178.8491 | $9,479,538.85 |
| Class A Common Stock | 2/16/2018 | (30,828) | $178.0474 | $5,488,845.25 |
| Class A Common Stock | 2/16/2018 | (38,569) | $177.0706 | $6,829,435.97 |
| Class A Common Stock | 2/16/2018 | (3,900) | $179.6693 | $700,710.27 |
| Class A Common Stock | 2/16/2018 | (36,554) | $178.8717 | $6,538,476.12 |
| Class A Common Stock | 2/16/2018 | (22,202) | $178.1515 | $3,955,319.60 |
| Class A Common Stock | 2/16/2018 | (29,844) | $177.1036 | $5,285,479.84 |
| Class A Common Stock | 2/15/2018 | (406) | $180.3357 | $73,216.29 |
| Class A Common Stock | 2/15/2018 | (3,694) | $179.4291 | $662,811.10 |
| Class A Common Stock | 2/15/2018 | (2,900) | $178.5521 | $517,801.09 |
| Class A Common Stock | 2/15/2018 | (1,400) | $177.7736 | $248,883.04 |
| Class A Common Stock | 2/15/2018 | (400) | $180.3575 | $72,143.00 |
| Class A Common Stock | 2/15/2018 | (2,800) | $179.5896 | $502,850.88 |
| Class A Common Stock | 2/15/2018 | (4,200) | $178.8098 | $751,001.16 |
| Class A Common Stock | 2/15/2018 | (1,600) | $177.8963 | $284,634.08 |
| Class A Common Stock | 2/15/2018 | (200) | $180.3650 | $36,073.00 |
| Class A Common Stock | 2/15/2018 | (2,650) | $179.5852 | $475,900.78 |
| Class A Common Stock | 2/15/2018 | (3,650) | $178.8003 | $652,621.10 |
| Class A Common Stock | 2/15/2018 | (1,500) | $177.8893 | $266,833.95 |
| Class A Common Stock | 2/15/2018 | (4,465) | $180.2660 | $804,887.69 |
| Class A Common Stock | 2/15/2018 | (63,662) | $179.3809 | $11,419,746.86 |
| Class A Common Stock | 2/15/2018 | (48,442) | $178.4164 | $8,642,847.25 |
| Class A Common Stock | 2/15/2018 | (10,931) | $177.5704 | $1,941,022.04 |
| Class A Common Stock | 2/15/2018 | (3,200) | $180.3313 | $577,060.16 |
| Class A Common Stock | 2/15/2018 | (44,233) | $179.4053 | $7,935,634.63 |
| Class A Common Stock | 2/15/2018 | (37,059) | $178.4507 | $6,613,204.49 |
| Class A Common Stock | 2/15/2018 | (8,008) | $177.5645 | $1,421,936.52 |
| Class A Common Stock | 2/14/2018 | (8,845) | $179.5662 | $1,588,263.04 |
| Class A Common Stock | 2/14/2018 | (31,019) | $179.0714 | $5,554,615.76 |
| Class A Common Stock | 2/14/2018 | (20,777) | $178.0790 | $3,699,947.38 |

## APPENDIX A
## Insider Trades

| Security | Trade Date | Number of Shares | Price | Gross Proceeds |
|---|---|---|---|---|
| Class A Common Stock | 2/14/2018 | (35,202) | $176.9656 | $6,229,543.05 |
| Class A Common Stock | 2/14/2018 | (7,209) | $175.8668 | $1,267,823.76 |
| Class A Common Stock | 2/14/2018 | (20,612) | $174.8769 | $3,604,562.66 |
| Class A Common Stock | 2/14/2018 | (3,836) | $173.6151 | $665,987.52 |
| Class A Common Stock | 2/14/2018 | (4,970) | $179.6034 | $892,628.90 |
| Class A Common Stock | 2/14/2018 | (25,355) | $179.1175 | $4,541,524.21 |
| Class A Common Stock | 2/14/2018 | (16,798) | $178.0848 | $2,991,468.47 |
| Class A Common Stock | 2/14/2018 | (24,400) | $176.9588 | $4,317,794.72 |
| Class A Common Stock | 2/14/2018 | (5,200) | $175.7685 | $913,996.20 |
| Class A Common Stock | 2/14/2018 | (14,005) | $174.9678 | $2,450,424.04 |
| Class A Common Stock | 2/14/2018 | (1,772) | $173.4880 | $307,420.74 |
| Class A Common Stock | 2/13/2018 | (3,785) | $175.3731 | $663,787.18 |
| Class A Common Stock | 2/13/2018 | (89,802) | $174.5992 | $15,679,357.36 |
| Class A Common Stock | 2/13/2018 | (23,863) | $173.8930 | $4,149,608.66 |
| Class A Common Stock | 2/13/2018 | (1,500) | $175.3860 | $263,079.00 |
| Class A Common Stock | 2/13/2018 | (50,133) | $174.7686 | $8,761,674.22 |
| Class A Common Stock | 2/13/2018 | (8,117) | $173.8951 | $1,411,506.53 |
| Class A Common Stock | 2/12/2018 | (24,270) | $177.0925 | $4,298,034.98 |
| Class A Common Stock | 2/12/2018 | (29,372) | $176.4228 | $5,181,890.48 |
| Class A Common Stock | 2/12/2018 | (38,335) | $175.3712 | $6,722,854.95 |
| Class A Common Stock | 2/12/2018 | (17,430) | $174.3833 | $3,039,500.92 |
| Class A Common Stock | 2/12/2018 | (13,693) | $173.3643 | $2,373,877.36 |
| Class A Common Stock | 2/12/2018 | (4,400) | $172.4355 | $758,716.20 |
| Class A Common Stock | 2/12/2018 | (6,155) | $177.2683 | $1,091,086.39 |
| Class A Common Stock | 2/12/2018 | (34,120) | $176.7343 | $6,030,174.32 |
| Class A Common Stock | 2/12/2018 | (25,025) | $175.5967 | $4,394,307.42 |
| Class A Common Stock | 2/12/2018 | (20,000) | $174.8800 | $3,497,600.00 |
| Class A Common Stock | 2/12/2018 | (5,100) | $173.5538 | $885,124.38 |
| Class A Common Stock | 2/12/2018 | (2,100) | $172.6457 | $362,555.97 |
| **Totals (Zuckerberg):** | | **(5,423,200)** | | **$978,500,158.65** |